**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

\----------------------------------------------------------- X
MATTHEW RONEN, :
: Civil Case No.:
                       Plaintiff, :
:
   v. : **COMPLAINT**
:
REDROUTE, INC. and BRIAN SCHIFF, in his :
individual and professional capacities, : **Jury Trial Demanded**
:
                       Defendant. :
\-----------------------------------------------------------X

      Plaintiff Matthew Ronen ("Plaintiff") alleges, against Defendants RedRoute, Inc. ("RedRoute" or the "Company") and Brian Schiff (together, the "Defendants"), as follows:

## PRELIMINARY STATEMENT

      1.      As a startup in the competitive technology space, RedRoute boasts about its generous parental leave policy in attracting new employees, claiming that it provides 16 weeks of paid leave to expectant mothers and fathers.

      2.      However, as Mr. Ronen learned firsthand, senior management, and particularly RedRoute's three founders, are openly hostile towards potential parents, and have openly stated that they would rather terminate an employee over allowing her to take parental leave.

      3.      Specifically, Mr. Ronen was in a meeting with two of the Company's founders, including Brian Schiff, in which they discussed the possibility that a female employee might be pregnant and how RedRoute needed to terminate her rather than risk her taking maternity leave after giving birth. Mr. Ronen immediately objected, telling them that it was illegal and wrong to make employment decisions based on someone's potential need for leave.

      4.      Despite Mr. Ronen's vociferous objections, RedRoute terminated this female employee. When Mr. Ronen confronted Mr. Schiff about his unlawful conduct, Mr. Schiff

brushed Mr. Ronen's concerns aside. Incredibly, Mr. Schiff ***admitted*** that he had "***gotten away***" with firing another pregnant employee months earlier, clearly demonstrating that he had no concern for his legal obligations.

5. In an environment so rife with discriminatory animus towards expectant parents, it is perhaps unsurprising that RedRoute responded with the same hostility when it learned that Mr. Ronen's wife was pregnant and that he would need leave to take care of his child. Despite experiencing a meteoric rise over his two years at the Company, during which time his compensation steadily increased and RedRoute even announced that it was making him the Company's Chief Operating Officer, upon learning of Mr. Ronen's need for paternity leave, RedRoute created phantom performance issues and terminated his employment mere weeks before his wife gave birth.

6. Mr. Ronen brings this action to ensure that the Company is not permitted to continue to discriminate against expectant parents and so that others are not likewise terminated because the Company does not want to provide its employees the parental leave it ostensibly promises.

## JURISDICTION AND VENUE

7. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is a diversity of citizenship among the parties and this action involves an amount in controversy in excess of $75,000, excluding interests and costs. Plaintiff resides in Maryland and was employed in Brooklyn, New York. Defendant RedRoute is a Delaware-registered foreign business corporation with operations in Brooklyn, New York and, upon information and belief, Defendant Brian Schiff resides in Queens, New York.

8. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred there. Defendant RedRoute has business operations located in this District, and Plaintiff's employment and performance occurred in this District.

## PARTIES

9. Plaintiff Matthew Ronen is a resident of the State of Maryland and worked at RedRoute. At all relevant times, Mr. Ronen was an "employee" under all relevant statutes.

10. Defendant RedRoute is a Delaware-registered foreign business corporation with a principal place of business located at 55 Prospect St., Suite 404, Brooklyn, NY 11201. At all relevant times, RedRoute was an "employer" within the meaning of all applicable statutes.

11. Defendant Brian Schiff is the Co-Founder and Chief Executive Officer of RedRoute and is a resident of the State of New York. At all relevant times, Mr. Schiff was an "employer" under all relevant statutes and exercised the authority to control Mr. Ronen's employment, including his work assignments, pay and responsibilities.

## ADMINISTRATIVE PREREQUISITES

12. Pursuant to NYCHRL § 8-502, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel within ten days of its filing, thereby satisfying the notice requirements of this action.

13. All other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

**I.    Mr. Ronen's Outstanding Performance at RedRoute**

14. After receiving his Masters of Business Administration from Cornell University, Mr. Ronen spent two years as the Associate Brand Manager for the Colgate-Palmolive Company

3

("Colgate-Palmolive") where he was responsible for leading the nationwide redesign of the Palmolive brand in the United States.

15. While at Colgate-Palmolive, Mr. Ronen was responsible for a P&L of over $500 million in North America. Mr. Ronen and his team consistently exceeded sales projections and beat their cost-reduction targets.

16. Mr. Ronen then decided to focus his efforts on giving back to the community by creating nationwide volunteer organizations.

17. He first founded Service Year, a nonpartisan national service organization that was the most ambitious national service initiative since AmeriCorps.

18. Mr. Ronen founded Service Year on the civilian voluntary national service model employed in Israel.

19. Mr. Ronen's idea proved so important that Service Year briefed both presidential campaigns in 2016 and received bi-partisan support.

20. Indeed, former presidential candidate Hillary Clinton adopted Service Year as part of her official platform, calling for Service Year to receive $20 billion in funding over 10 years.

21. As a result of Mr. Ronen's innovative ideas, Service Year was acquired by a consortium led by the Aspen Institute, a nonpartisan thinktank.

22. However, not satisfied with creating one new model for voluntary service in the United States, Mr. Ronen then turned his efforts to creating a second organization, ServiceCorps.

23. ServiceCorps was the first corporate national service program when it launched. It allowed recent college graduates to defer existing job offers at leading corporations for one year while they worked for a nonprofit or public organization.

24. Once again, Mr. Ronen's efforts at building a successful organization from the ground up caught the attention of larger companies, and ServiceCorps was able to partner with Citibank, General Electric, and Bloomberg L.P.

25. Having started two separate companies on his own, Mr. Ronen gleaned a wealth of experience with all aspects of creating organizations and putting in place the capital and personnel to ensure their success.

26. By way of example, Mr. Ronen gained firsthand experience performing all of a nascent company's business operations, including working in the financial, operations, marketing and fundraising sides of fledgling organizations.

27. Given his breadth of experience, Mr. Ronen became an attractive target for startup companies, who could draw on his wealth of experience to help them raise capital, organize operations and create the solid foundation necessary for success in a competitive marketplace.

28. As a result, when RedRoute, a call center automation company, was looking for someone to head its core product, Mr. Ronen's experience made him an ideal target.

29. The Company therefore hired him as its first senior hire and Head of Interactive Voice Response ("IVR") in March 2019.

30. RedRoute soon realized that Mr. Ronen was capable of performing far more than the Head of IVR role called for, however, and in less than six months, Mr. Ronen was promoted to the Head of Business Development position.

31. Promoting Mr. Ronen to the Head of Business Development position less than six months after he was hired was obviously a substantial promotion and reflected the Company's growing confidence in Mr. Ronen's abilities. As the Head of Business Development, Mr. Ronen was functionally the second most senior employee at the Company, second only to Mr. Schiff,

with whom he worked side by side. In his new role, Mr. Ronen was responsible for a wide variety of tasks as the Company attempted to grow and secure a more prominent position competing with traditional brick and mortar call centers.

32. Most significantly, Mr. Ronen was tasked with raising financing for RedRoute as it sought to expand its operations and its reach.

33. Mr. Ronen spent months taking meetings with potential investors, creating marketing materials and attempting to raise RedRoute's profile to make it more attractive to sources of capital.

34. Mr. Ronen's efforts yielded spectacular results. In just the first year as the Head of Business Development, Mr. Ronen introduced the Company to a venture capital firm, Acceleprise, which invested $100,000 in RedRoute. In addition, the principal of Acceleprise joined RedRoute as a formal advisor. Mr. Ronen also secured an additional $500,000 in revenue-based financing from Lighter Capital.

35. In the cases of both Acceleprise and Lighter Capital, Mr. Ronen was responsible for all aspects of securing the capital, from finding the investors, discussing the terms of the financing and overseeing the due diligence process.

36. Mr. Ronen's leadership also played a pivotal role in helping RedRoute survive the challenges posed by the COVID-19 pandemic. By way of example only, Mr. Ronen led the Company's efforts to secure a Paycheck Protection Program loan in the amount of $312,500 and an Economic Injury Disaster Loan of $150,000. Similarly, in June 2020, Mr. Ronen was instrumental in helping RedRoute secure a $400,000 convertible note from an existing investor.

37. Without this influx of capital that the Company secured through Mr. Ronen's efforts, RedRoute would not have been able to survive the COVID-19 pandemic.

38. As a result of Mr. Ronen's outstanding performance, beginning in September 2020, RedRoute sought to expand his responsibilities even further, and to formalize his role in the leadership of the Company. To that end, Red Route had Mr. Ronen start performing the duties of the COO of the Company and he was given a $20,000 raise in his base salary as of October 1, 2020.

39. In pushing for Mr. Ronen to take over as the Company's COO, Mr. Schiff made clear that "the reason for Matt to take over as COO is that it will help RedRoute get bigger faster" and that Mr. Ronen "**is one of our best people, and he's ready to step up his game**." Mr. Schiff further recognized that Mr. Ronen "is best positioned to hold management and ops responsibility as it is aligned with his strengths."

40. Mr. Ronen began the process of acting as RedRoute's *de facto* COO by taking over the day-to-day operations of the Company, with the idea that he would eventually be responsible for managing the entire company so that Mr. Schiff could focus on a more externally facing role. As part of his duties as RedRoute's *de facto* COO, Mr. Ronen and Mr. Schiff met daily to talk about the Company's strategy and operations.

41. As a result, Mr. Schiff and Mr. Ronen comprised RedRoute's Executive Team, and Mr. Ronen was made one of four members of the Company's leadership, alongside its three founders, Mr. Schiff, Samuel Krut and Jacob Cooper. The Company also paid for executive coaching sessions for Mr. Ronen, Mr. Schiff and Mr. Krut so that they could all develop the skills necessary to lead a burgeoning company as it grew and sought to expand.

42. In subsequent discussions with Mr. Ronen, Mr. Schiff and he agreed that he would formally be installed as the COO on January 1, 2021, with an accompanying raise in his salary.

43. Moreover, RedRoute announced internally to RedRoute's leadership employees that Mr. Ronen would be named the COO in mid-November 2020. In fact, Mr. Schiff drafted an internal document in which he identified making Mr. Ronen the Company's COO as an integral part of RedRoute's strategy to "drive maximum growth."

44. Mr. Ronen's future with the Company appeared to be bright.

## II.   RedRoute's Animus Towards Employees Requiring Parental Leave

45. In the summer of 2020, Mr. Ronen and his wife learned that she was pregnant with the couple's first child.

46. What should have been the most joyous event in Mr. Ronen's life was fraught with anxiety as he was terrified of the professional repercussions that he would face once the Company, and Mr. Schiff in particular, learned that his wife was about to give birth.

47. Based on RedRoute's treatment of other employees in similar situations, Mr. Ronen was understandably concerned that his bright future with the Company would be cut short once it realized that he was about to become a father and would require time off to help with the care of his newborn child.

48. Specifically, on September 3, 2020, Mr. Ronen was called into an emergency meeting with Mr. Schiff, Sam Krut (co-Founder and Head of Sales) and Luke Bushner (Head of Products).

49. During this meeting, Mr. Bushner told Mr. Ronen that he, Mr. Krut and Mr. Schiff had several conversations about the possibility that a female employee, Laura Pelaez (Product Manager), was pregnant because she had been taking several doctors' appointments and wanted Mr. Ronen's advice as to what they should do about it.

50. Mr. Bushner told Mr. Ronen that Mr. Schiff and Mr. Krut had been pressuring him to say whether Ms. Pelaez was pregnant so that Mr. Schiff could "pull the trigger" and fire Ms. Pelaez because RedRoute did not want to be in a position where it would have to pay her for the maternity leave to which she was entitled under the Company's policies.

51. Mr. Ronen immediately voiced his objections, saying that the Company should not even be considering making employment decisions based on an employee's potential pregnancy and need for leave.

52. When Mr. Schiff and Mr. Krut were unmoved by Mr. Ronen's opposition to the Company's unlawful employment decisions, Mr. Ronen entreated Mr. Schiff to refrain from taking any action against Ms. Pelaez based on the mere possibility that she might be pregnant.

53. Finally, Mr. Schiff agreed, saying that he would not terminate Ms. Pelaez at that time and would wait to make any final decisions.

54. The reprieve that Mr. Ronen secured for Ms. Pelaez was short lived as she needed to take another doctor's appointment in September 2020, after which the Company immediately terminated her employment.

55. Mr. Ronen proceeded to confront Mr. Schiff directly after learning of the unlawful decision to terminate Ms. Pelaez's employment, telling him it was illegal to terminate someone just because she was pregnant.

56. Outrageously, Mr. Schiff brushed Mr. Ronen's complaints aside by bragging that he had terminated another female employee, Kalyani Taru, the day after Ms. Taru had told him that she was pregnant.

57. Effectively, because Mr. Schiff had "gotten away" with terminating a pregnant employee once, he believed that there was nothing stopping him from continuing to engage in such transparently discriminatory behavior.

### III. RedRoute Unlawfully Terminates Mr. Ronen's Employment

58. Mr. Ronen's concerns about RedRoute's discriminatory animus proved to be well founded.

59. Shortly after he informed Schiff about his wife's pregnancy in November 2020, RedRoute issued Mr. Ronen a performance review in the first week of December, which, for the first time, contained phantom criticisms about his performance.

60. Mr. Schiff then told Mr. Ronen that he had purportedly decided to delay Mr. Ronen's promotion to the COO position until February 2020, ostensibly so that Mr. Ronen could get more "experience."

61. Of course, Mr. Schiff had no issues with Mr. Ronen's experience when he had first told him and the Company's leadership employees in September 2020 that Mr. Ronen would be named COO prior to learning that he needed to take paternity leave.

62. Subsequently, in late December 2020, Mr. Schiff sent Mr. Ronen a message asking him, "are you planning to take formal paternal leave time."

63. In response, Mr. Ronen told Mr. Schiff that although he intended to take paternity leave, he understood that his responsibilities as the soon to be COO could make taking the full 16 weeks allotted by RedRoute's policies difficult.

64. As a result, he told Mr. Schiff that he was willing to be "flexible" and work with Mr. Schiff to ensure that his paternity leave caused the Company minimal disruptions.

65. Tellingly, Mr. Schiff responded by telling Mr. Ronen "I'm glad to hear that because **this is something I have been concerned about**."

66. Less than two weeks later, Mr. Schiff told Mr. Ronen that RedRoute had decided to terminate his employment.

67. Incredibly, despite the fact that RedRoute had expressed enough confidence in Mr. Ronen's job performance to decide to make him the Company's COO (and second most senior employee, only to Mr. Schiff), Mr. Schiff claimed that the termination decision was supposedly based on Mr. Ronen's performance.

68. Mr. Schiff further claimed that it would be "better for" Mr. Ronen to be let go from the Company, with the implication being that he would now have more time to spend with his newborn child, yet another example of Mr. Schiff's discriminatory animus towards new parents.

69. Throughout his meteoric rise with the Company, Mr. Ronen had received multiple promotions and compensation increases. In fact, at no point prior to his termination was Mr. Ronen *ever* informed that the Company had any issues with his performance. By way of example only, the Company has previously attempted to address performance deficiencies with its employees by placing them on Performance Improvement Plans wherein RedRoute identified specific areas of performance that required progress and allowed the employees the opportunity to address such deficiencies. Not only was Mr. Ronen never given such a Performance Improvement Plan, he was never given an opportunity to address the supposed performance deficiencies that RedRoute used to justify the termination of his employment. In fact, in December 2020, Mr. Schiff had told Mr. Ronen that he wanted Mr. Ronen to participate in the Company's fundraising efforts in February 2021. It was only after Mr. Ronen confirmed that he

11

would need to take leave during that time period that RedRoute decided to terminate his employment.

70. Based on the fact that the first time that Mr. Ronen was made aware of any performance deficiencies was after the Company learned of his need to take paternity leave, as well as RedRoute's treatment of other employees who it believed would require such leave, there is no doubt that these supposed performance issues are merely a thin pretext for its unlawful discriminatory decision.

**FIRST CAUSE OF ACTION**
**(Discrimination in Violation of the NYSHRL)**
*Against All Defendants*

71. Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

72. By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of his caregiver status in violation of the NYSHRL.

73. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer monetary and/or other economic harm.

74. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, injury, pain, ailments and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering.

75. Defendants' unlawful actions constitute malicious, willful and wanton violations of the NYSHRL.

## **SECOND CAUSE OF ACTION**
### **(Retaliation in Violation of the NYSHRL)**
### *Against All Defendants*

76.     Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

77.     By the actions described above, among others, Defendants retaliated against Plaintiff in violation of the NYSHRL.

78.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm.

79.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, injury, pain, ailments and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering.

80.     Defendants' unlawful actions constitute malicious, willful and wanton violations of the NYSHRL.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants, through the following relief:

A.     A declaratory judgment that the actions of Defendants complained of herein violate the laws of the State of New York;

B.     An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

      C.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to past and future lost earnings;

      D.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputations and loss of career fulfillment;

      E.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, emotional pain and suffering and emotional distress;

      F.      An award of punitive damages in an amount to be determined at trial;

      G.      An award of liquidated damages in an amount to be determined at trial;

      H.      An award of attorneys' fees and costs that Plaintiff has incurred in this action to the fullest extent permitted by law; and

      I.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: May 14, 2021
       New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
    Michael J. Willemin
    Renan F. Varghese

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
mwillemin@wigdorlaw.com
rvarghese@wigdorlaw.com

*Attorneys for Plaintiff*