

**John S. Crain**
jcrain@wigdorlaw.com

July 30, 2025

<u>**VIA ECF**</u>

Judge Rachel P. Kovner
Eastern District of New York
225 Cadman Plaza East Courtroom 4E-N
Brooklyn, New York 11201

      Re:    <u>Matthew Ronen v. RedRoute, Inc. and Brian Schiff, No. 21 Civ. 02732</u>

Dear Judge Kovner:

We represent Plaintiff Matthew Ronen ("Plaintiff") and write to submit supplemental briefing on the 'impact element' pursuant to Your Honor's order on July 21, 2025.  The Court is now familiar with the parties' arguments regarding the New York City Human Rights Law ("NYCHRL") impact issue, as well as Plaintiff's contentions about Defendants' failure to participate in discovery on this topic, as set forth in Dkts. 99 and 100.  Plaintiff writes here to set forth the key evidence that emerged at trial on the impact issue notwithstanding the jury's verdict,[1] and to briefly summarize the relevant case law in one place.

**I.**      **The Evidence Shows that Mr. Ronen Remained an Inhabitant of New York City During his Brief Stay in Maryland**

At the time he accepted the role at FlipCX, Inc. f/k/a RedRoute, Inc. ("RedRoute") in early 2019, Matthew Ronen lived with his future wife, Amanda Bresler, in New York City.  Tr. at 42:13-15.  After marrying in 2019, the two moved into an apartment in Tribeca.  <u>Id.</u> at 320:18-24.  They were physically present in New York City until just a little over a month before Mr. Ronen's termination.  <u>Id.</u> at 107:24-108:12.  Mr. Ronen testified credibly that at the time of his termination he was in Maryland temporarily in his wife's grandmother's home, but that he and his wife retained their apartment in New York City.  <u>Id.</u> at 107:19-23.  The two planned to stay in Maryland only through the birth of their child, <u>id.</u> at 107:24-108:12, and did not sublease their apartment.  It is unlikely they would have gone to Maryland for the birth had it not been for the COVID pandemic.  <u>See id.</u> at 108:13-16; 268:20-22.  On departing for their temporary relocation to Maryland, Ms. Bresler and Mr. Ronen left most of their belongings in New York City.  <u>Id.</u> at 127:23-128:3.

---

[1]     Needless to say, the impact issue should be considered separately from the verdict. The termination was an "impact" felt in New York City regardless of whether it was in fact discriminatory. Plaintiff respects and acknowledges the jury's verdict pending a possible appeal.



Mr. Ronen and Ms. Bresler remained firmly rooted in New York City despite their temporary—and as originally intended, short—stint in Maryland, including keeping their New York City lease and personal doctors and continuing to make charitable donations to institutions in New York City.  Id. at 108:20-109:1.  To this day, the couple have retained property in New York City.  Day 2 Tr. at 307:12-17 (testimony of Amanda Bresler).  Ms. Bresler lived in that property before marrying Mr. Ronen.  Id. at 320:18-24.

Mr. Ronen did not initially establish himself in Maryland and worked from a kitchen table rather than an office.  Id.at 136:10-11.  Nor did he and his wife take up a lease or other property interest in Maryland during their initial sojourn there.  Id. at 267:25-268:4.  Crucially, had Mr. Ronen not been terminated, he and his family would have returned to New York City.  Id. at 108:17-19.

It is also important to understand that critical portions of the events leading up to Mr. Ronen's termination, including much of the relevant decision-making and planning related to the Chief Operating Officer ("COO") position, occurred while Mr. Ronen was still physically present in New York City.  The COO transition document was originally drafted in August of 2020.  Tr. at 190:19-23.  Mr. Schiff has testified that he made the decision to terminate Mr. Ronen because Mr. Ronen failed to "meet the targets established for him in November."  Tr. at 445:1-13.  In other words, it is undisputed that the COO transition process had been unfolding, for better or worse, for several months and in New York City before Mr. Ronen temporarily relocated to Maryland.

## II.    Defendants' Deflections About the Pandemic and Their "Sublease"

Defendants vaguely suggested that they disbanded their New York City office and that they did not operate an office during the pandemic.  But this evidence and testimony was not credible.  It is also not cogent to the impact issue.

In 2019, RedRoute had its office in Brooklyn.  Day 2 Tr. at 362:7-12.  It still has an office in New York City.  Id. at 363:1-3.  Krut claimed vaguely that the lease on the Brooklyn location ended at some time after the beginning of the pandemic.  Id. at 363:6-8.  But Mr. Ronen testified that he and Mr. Schiff continued working in the office on occasion during the pandemic.  Id. at 126:7-10.  Neither Mr. Krut nor Mr. Schiff disputed that testimony, despite testifying after Mr. Ronen.  Defendants' testimony on this topic was, in sum, inconclusive at best.  Defendants have always maintained an office in New York City and never suggested that they operated an office elsewhere.  Even if they lacked a physical location for some brief period in 2020 or 2021, they did not credibly explain when that period began or ended—information that would have been easily collectible by them—and no witness testified that the company moved somewhere else.

Krut offered the distraction that the company has only ever "subleased" offices between 2019 and the present, id. at 363:9-12, though as a matter of commonsense a sublease is not of any lesser ownership status than a lease. The suggestion that it is a less important or more temporary kind of lease is just a play on the prefix "sub."  A sublease, of course, can be just as official,



permanent, or expensive as a regular lease, and Defendants' testimony about a "sublease," standing alone, fails to convince.  If the lease were temporary or tentative, someone would have testified that it was month-to-month; that it occupied only the end of the term of a previous tenant; that the space was not fully furnished; or any number of other relevant facts that would have tended to show that the "sublease" was temporary or ad hoc.  There was no such testimony or evidence.  Even Krut admitted that the company's new lease has been continuous since 2021.  Id. at 363:13-14.  The testimony implies that Defendants' leases were (and are) neither temporary nor ad hoc.  Indeed, Krut testified that the company works out of a WeWork in California and out of a tiny, 400 square foot office in London.  Id. at 377:1-14.  But he never testified that the New York City space is part of a workshare or physically small.  Krut testified that the company has "ten desks" in New York City, Tr. 376:20-21, but that could mean anything up to an entire floor of an office building depending on how desks are arranged or whether there are common spaces like kitchens or conference rooms.  In sum, the testimony intended to downplay Defendants' New York City presence was vague at best.  Defendants could easily have filled in the gaps but opted not to.

### III.      Brief Procedural Background Regarding Discovery into the Impact Issue

As the Court knows, Defendants first surfaced the impact issue on the day of the pretrial conference, July 8, 2025.  See Dkt. 93.  On July 13, 2025, Defendants attempted to produce new documents relevant to the impact issue.  See Dkt. 99.  The next day, July 14, Plaintiff pointed out in correspondence that many of these productions would have been responsive to other document requests, strongly suggesting that document searches had not been completed as requested and that the attempted production on July 13, 2025, had been cherrypicked for documents favorable to Defendants, just as Defendants cherrypicked prior productions.  See Dkt. 73 at 12 ("The court rejects defendants' suggestion that Schiff knows best which of his thousands of texts are broadly relevant. Parties to litigation have the right to challenge the relevance of documents through discovery motion practice, rather than unilateral determinations by individuals," like Schiff, "in whose interest it is to seek to withhold the production of documents that are damaging to their case.") (quotations and citations to quoted cases omitted).

Plaintiff wishes to note two likely conclusions from these facts.  First, the impact defense appears to have been highly opportunistic.  According to Defendants, they have always been aware that Plaintiff was physically in Maryland when he was terminated.  The fact that they never raised the impact issue by motion is telling.  Second, Defendants were aware of their new defense at the latest on July 8, 2025 and apparently had time to scratch together a document production over the following five days.  If Defendants could gather these documents, then they equally had the opportunity to close the loop on discovery into this issue and to provide fair responses in cooperation with Plaintiff.  A late discovery process like this, while disfavored, is not unheard of.  Indeed, at the pretrial conference the Court indicated its willingness to allow Defendant to try its defense, even if late breaking.  In general, the Court was fair-minded and conscientious on this issue and did not wish to deny Defendants the opportunity to defend themselves, and Defendants had no purely legal reason to fear requesting a truncated discovery



process focused on the impact issue.  The point here is that Defendants had a last opportunity starting July 8, 2025 at the latest to provide discovery on this issue, yet pointedly declined to do so or even try to do so.  Instead, they rolled the dice on yet another cherry-picked production, conducted discovery unilaterally, and simply accepted the result when the Court ruled that they could not use any of the documents at trial for their case-in-chief—a highly predictable outcome from a legal perspective.  The simplest explanation for this behavior is that Defendants knew the evidence, fairly and fully disclosed, would be unfavorable to them.  Thus, they could only tolerate a unilateral, controlled discovery process, or no process at all.  The Court, as factfinder, may consider all of this conduct and its import.[2]

## IV.    <u>Discussion</u>

In effect, Defendants are applying for an exception to the NYCHRL, based on Mr. Ronen's temporary relocation to Maryland.  But the facts here fit squarely within the ambit of cases holding that the NYCHRL applied notwithstanding a temporary presence outside of the State. The testimony showed that Mr. Ronen was located in Maryland only temporarily at the time of his termination.  At that time, he had been present in Maryland for just a little over a month, compared to nearly two years working for the company from New York City.  That temporary presence in Maryland was made possible only by the COVID-19 pandemic, during which time many people temporarily relocated or worked remotely.  And Mr. Ronen had every intention of returning to New York City, where he and his wife maintained a lease, had he not been fired.

These facts fit squarely under the holding of <u>Syeed v. Bloomberg L.P.</u>, 235 N.E.3d 351 (2024), where the New York Court of Appeals held that the NYCHRL applies to those who "lose[] the chance to work" in New York City.  Mr. Ronen would have returned to New York City had it not been for his termination.  Accordingly, there was a New York City-based impact, and the NYCHRL applies.

Moreover, Mr. Ronen spent the vast majority of his employment within New York City, most of it working from Defendants' office location in New York City.  No case has ever held that a temporary relocation under those circumstances exempts an employee from coverage under the NYCHRL.  <u>See</u> <u>Wexelberg v. Project Brokers LLC</u>, No. 13 Civ. 7904, 2014 WL 2624761, at *11 (S.D.N.Y. Apr. 28, 2014) (plaintiff who worked in New York City for 5 of 11 weeks of employment stated claim under NYCHRL and NYSHRL); <u>see</u> <u>id.</u> (explaining that looking only to a plaintiff's physical location at the time of an adverse action "could create a major loophole in the statutory protection that the Court of Appeals envisaged for employees residing out-of-state but working in New York.")  Mr. Ronen relocated only temporarily and only because of the pandemic but remained "based out of the New York City office, and he carried out the same job functions and responsibilities as he had in New York City.  That is, Plaintiff did not transition into a new or remote role, and he did not become an employee of some other office.

---

2       At this point, it is moot whether there will be a discovery sanction or an instruction to the jury.  The Court, instead, may take this evidence as probative of Defendants' lack of credibility.



Shaughnessy v. Scotiabank, No. 22 Civ. 10870 (LAP), 2024 WL 1350083, at *8 (S.D.N.Y. Mar. 29, 2024).  And it is of critical importance here that the relevant events surrounding Mr. Ronen's COO transition (whether or not a jury found those events discriminatory) occurred in New York City.  See Johnson v. Everyrealm, Inc., 657 F. Supp. 3d 535, 556–57 (S.D.N.Y. 2023) (holding that NYCHRL applied where some harassment occurred within New York City, even though the employee worked in New York City only two weeks per month).

Defendants' evidence about their "sublease" and about the pandemic closure fails to rebut any of these relevant facts.  And the cases Defendants have cited to date are inapposite.  See Shiber v. Centerview Partners LLC, No. 21 Civ. 3649, 2024 WL 3274420, at *3 (S.D.N.Y. July 2, 2024) (granting plaintiff's motion for leave to amend and holding that under Syeed, the plaintiff would have satisfied the impact test by alleging that she "lost the chance to work in New York when she was allegedly fired for discriminatory reasons"); Smith v. Vera Inst. of Just., Inc., No. 21 Civ. 6430, 2023 WL 11879682 (E.D.N.Y. Aug. 11, 2023) (plaintiff left New York City on his own accord with no plans to return.)

Finally, the Court should consider Defendants' approach to document production on this issue. Rather than trying to close the loop and put their evidence to a jury, they rolled the dice on a unilateral production and accepted the outcome when the Court struck their evidence.  The Court can and should conclude that Defendants preferred that there be no discovery on this issue, and that the documents withheld would have been unfavorable to Defendants. For instance, the documents withheld likely would have showed plans to reopen a New York City office promptly after the pandemic closure, and likely would have showed communications instructing employees to return to the office.

It was a privilege to try this case before the Court and we continue to appreciate the Court's time and attention to these matters.

Respectfully submitted,

John S. Crain